**Mary KEARNEY, as Administratrix of the Estates of Maureen O'Neill, Charlene O'Neill, Stacy O'Neill, and Leanne O'Neill, Plaintiff,**

v.

**PHILIP MORRIS, INC., Defendant.**

**Civil Action No. 92–11079–REK.**

United States District Court,
D. Massachusetts.

Feb. 16, 1996.

---

Stephen R. Fine, Stephen R. Fine & Associates, Manchester, NH, Edward L. Sweda, Jr., Dorchester, MA, for Mary Kearney.

Marshall Simonds, Thomas J. Griffin, Jr., Goodwin, Proctor & Hoar, Boston, MA, Walter L. Cofer, William J. Crampton, Shook, Hardy & Bacon, Kansas City, MO, for Philip Morris Companies Inc. and Philip Morris, Inc.

## OPINION

KEETON, District Judge.

### I.

Plaintiff, Mary Kearney, brings this diversity action against defendant on behalf of the estates of her daughter (Maureen O'Neill) and three grandchildren (Charlene O'Neill, Stacy O'Neill, and Leanne O'Neill) who died in a house fire on May 27, 1990. The fire was allegedly caused by a Marlboro Light cigarette designed, produced and marketed by defendant, after the father of the children and Maureen's husband, Myles O'Neill, who was intoxicated, dropped a lit cigarette on a couch, left it unattended, and went to bed in another room. Plaintiff's complaint alleges that the defendant's product is defective and unreasonably dangerous in that it has an unreasonably dangerous propensity to ignite upholstered furniture. This claimed defect in design is alleged to constitute negligence, breach of warranty, a violation of Mass. Gen.L. ch. 93A, and to support imposition of liability under Restatement (Second) of Torts §§ 389 and 394.

Pending before the court in this case is the Motion by Philip Morris, Inc., for Judgment on the Pleadings, or in the Alternative, for Summary Judgment (Docket No. 60, filed March 17, 1995) together with numerous supplemental memoranda from defendant and responses from plaintiff.*

As a prudential matter, I consider the summary judgment basis for defendant's motion and elect not to consider whether defen-dant might in any event be entitled to a judgment on the pleadings.

For the purposes of advancing its contention that it is entitled to summary judgment under the standards established by Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the District of Massachusetts, defendant

> assumes the following facts: on May 27, 1990, Myles O'Neill dropped a lighted Marlboro Light cigarette onto a piece of upholstered furniture in his home while intoxicated; unaware of his action, he went to bed; and the cigarette ignited the upholstery and started a fire that led to the death of the decedents.

Defendant's Motion (Docket No. 60), p. 1. One further fact that both plaintiff and defendant have assumed for the purposes of the summary judgment motion is that the article of furniture on which Myles O'Neill left the cigarette ("the O'Neill couch") was constructed with an outer covering of thermoplastic material directly over ignition-prone non-flammability treated cotton padding. *See* Plaintiff's Memorandum of Law (Docket No. 66), p. 5; Defendant's Reply Brief (Docket No. 71), p. 24.

One critical aspect of the plaintiff's theory in this case is that if the allegedly defective Marlboro Light cigarette had been designed according to plaintiff's proposed alternative reduced-ignition-propensity design, the fire would not have occurred. *See* Plaintiff's Memorandum of Law (Docket No. 66), p. 18; Plaintiff's Complaint ¶ 10 (Docket No. 1).

---

* (a) Defendant's Memorandum of Support (Docket No. 61, filed March 17, 1995);
(b) Plaintiff's Memorandum in Opposition (Docket No. 65, filed July 26, 1995);
(c) Plaintiff's Memorandum in Support of Memorandum in Opposition (Docket No. 66, filed August 23, 1995);
(d) Defendant's Memorandum of Support (Docket No. 71, filed September 14, 1995), and affidavit of Jerry Whidby (Docket No. 72, filed September 14, 1995), affidavit of Frederic Clarke (Docket No. 73, filed September 14, 1995), affidavit of Gordon Damant (Docket No. 74, filed September 14, 1995), affidavit of Edward Gee (Docket No. 75, filed September 14, 1995), and affidavit of Susan Ellerin (Docket No. 76, filed September 14, 1995);

(e) Defendant's Supplemental Memorandum (Docket No. 83, filed October 20, 1995), and affidavit (Docket No. 84, filed October 20, 1995), and affidavit (Docket No. 85, filed October 20, 1995);
(f) Plaintiff's Memorandum in Support of Opposition (Docket No. 90, filed December 29, 1995);
(g) Plaintiff's Memorandum in Support of Memorandum in Support of Opposition (Docket No. 92, filed January 16, 1996);
(h) Defendant's Surreply Brief (Docket No. 94, filed January 18, 1996), and affidavit of Thomas Griffin (Docket No. 95, filed January 16, 1996), and affidavits (Docket No. 96, filed January 16, 1996);
(i) Plaintiff's Exhibit (graph) (Docket No. 99, filed January 25, 1996).

## II.

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (quoting Fed. R.Civ.P. 56 advisory committee's note). If the pleadings, depositions, answers to interrogatories, admissions and any affidavits on file show that there is no genuine issue as to a material fact, then the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Where, as here, the moving party does not have the burden of proof at trial, that party nevertheless must make a showing, by "pointing out to the district court," that the evidence is insufficient to support the non-moving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once this showing has been made, it is up to the nonmoving party to proffer sufficient competent evidence to establish the existence of a genuine issue of material fact. *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir. 1992). "Genuine" means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On issues where the nonmovant bears the burden of proof, he or she must present definite, competent evidence to rebut the motion. *See Id.* at 256–57, 106 S.Ct. at 2514–15.

## III.

### A.

The parties agree and the court concludes that the law of Massachusetts is the source to which this court must look for the substantive law to be applied in this case. The rules of law as to the scope of products liability include rules regarding duty and legal cause (including both "cause-in-fact" and other aspects of legal cause).

### B.

Looking to Massachusetts law, I must consider, in relation to the claim of breach of warranty by reason of a design defect, what the plaintiff must prove in this case to satisfy the duty and legal cause (including cause-in-fact) elements of the design defect theory of liability for the deaths from smoke inhalation in this case.

■ Liability for breach of warranty is premised on the principle that "The seller warrants that the product is 'fit for the ordinary purposes for which such goods are used.'" *Hayes v. Ariens Co.*, 391 Mass. 407, 462 N.E.2d 273, 277 (1984) (quoting Mass. Gen.L. ch. 106 § 2–314(2)(c)). Thus a breach of warranty can occur if either (1) the product is defectively designed, or (2) foreseeable users are not adequately warned of the dangers associated with its use. *Id.* For design defect claims, Massachusetts law requires that a plaintiff show that the manufacturer has violated its duty to design products "so that they are reasonably fit for the purposes for which they are intended." *Smith v. Ariens Co.*, 375 Mass. 620, 377 N.E.2d 954, 957 (1978). A product is "reasonably fit" for its purposes if the design avoids the "reasonably foreseeable risks attending the product's use...." *Back v. Wickes*, 375 Mass. 633, 378 N.E.2d 964, 969 (1978).

■ In order to succeed in a breach of warranty case under Massachusetts law, a plaintiff must prove that his or her injury was, more probably than not, caused by a defect in the product. *See, e.g., Walsh v. Atamian Motors, Inc.*, 10 Mass.App.Ct. 828, 406 N.E.2d 733, 734 (1980) (buyers of used car who failed to show that probable cause of vehicle's mechanical problems was attributable to a defect in the vehicle at the time of purchase failed to establish claim of breach of warranty). A plaintiff is not bound to exclude every possible cause for injury, but a plaintiff is required to show that, more probably than not, the breach of warranty was a cause of the injury. *See Benavides v. Stop & Shop*, 346 Mass. 154, 190 N.E.2d 894, 897 (1963).

**C.**

In this case, plaintiff also makes a negligence claim with respect to design. As in relation to breach of warranty, so also as to a claim of negligent design, in order to succeed under Massachusetts law plaintiff must show that a defect attributable to the manufacturer's negligence was a cause of the injury. *Swartz v. General Motors Corp.*, 375 Mass. 628, 378 N.E.2d 61, 65 (1978). A plaintiff alleging that a product was negligently designed can proceed by showing that the product either was a proximate cause of the injury or was a proximate cause of an enhancement of the injury a person sustained in an otherwise foreseeable accident. *Simmons v. Monarch Mach. Tool Co.*, 413 Mass. 205, 596 N.E.2d 318, 322–323 (1992). A plaintiff need not prove the exact cause of the accident or disprove every possible cause, but he or she must show that there is a greater likelihood that the defendant's negligence was a proximate cause of the injury (or enhancement of the injury) than that it was not. *Enrich v. Windmere Corp.*, 416 Mass. 83, 616 N.E.2d 1081, 1084 (1993).

**D.**

Plaintiff's claim of an alleged violation of Mass.Gen.L. ch. 93A is based on the same breach of warranty and negligence claims described in part B and part C above. *See* Plaintiff's Complaint ¶ 31 (Docket No. 1). Accordingly, if plaintiff's claims of breach of warranty and negligence fail, plaintiff's Mass. Gen.L. ch. 93A claim also fails.

**E.**

Plaintiff's claim based upon alleged liability under Restatement (Second) of Torts §§ 389 and 394 (and the contention that these sections are consistent with Massachusetts law) depends also on proof of causation-in-fact. *See* Restatement (Second) of Torts § 389, Comment (d) (1963–1964) ("the supplier will be liable if, but only if, his conduct is, in law, the cause of bodily injury sustained by another ...").

**F.**

Causation-in-fact is thus a crucial element to plaintiff's case, under each of the plaintiff's various theories of recovery.

**IV.**

For reasons explained in Part V. below, I conclude that I need not decide many of the questions briefed and argued in this case, because the plaintiff's case fails to survive the cause-in-fact requirement. Plaintiff must prove that the alleged negligence, or the alleged defect in the cigarette, more probably than not was a cause-in-fact of the injury; otherwise, defendant is entitled to summary judgment as a matter of law. As explained below, plaintiff's evidence is inadequate to support a reasoned finding by a finder of fact that the alleged negligence or the alleged defect of the cigarette was, more probably than not, a cause-in-fact of the fatal fire, and that the deaths in this case, more probably than not, would not have occurred if the cigarette left unattended by Myles O'Neill had been a cigarette of plaintiff's proposed alternative design.

In reaching a decision on this ground, as explained more fully in Part V below, I am not deciding any issue as to the admissibility of the plaintiff's proffered expert evidence. Instead I assume, without deciding, that plaintiff's proffered expert evidence is admissible. The Rules of Evidence and precedents regarding standards of admissibility of expert testimony, however, provide useful and informative analogies that shed light on the central issue regarding the *sufficiency* of evidence in this case.

Rule 702 of the Federal Rules of Evidence requires that the evidence or testimony of an expert witness "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Thus a court must "determine whether the proposed testimony is relevant and fits the facts of the case." *United States v. Shay*, 57 F.3d 126, 133 (1st Cir.1995) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, ——–——, 113 S.Ct. 2786, 2795–2796, 125 L.Ed.2d 469 (1993)):

The concept of 'fit' requires that a valid connection exist between the expert's testimony and a disputed issue.... If a plaintiff contends that he or she developed can-

cer after being exposed to chemical X and seeks to support that contention with expert testimony that chemical X causes cancer in animals, the testimony will not fit the facts of the case and should be excluded unless the plaintiff also offers reliable expert testimony that results observed in the animal studies are transferable to humans.

*Shay,* 57 F.3d at 133, n. 5 (citations omitted).

## V.

In critical respects, the opinions in plaintiff's expert affidavits, even if assumed to pass the threshold of admissibility, do not fit the facts of this case in a way that would enable a finder of fact, even after taking all of the proffered evidence into account, to make a finding of fact favorable to the plaintiff on the cause-in-fact issue. Viewing plaintiff's expert affidavits in the light most favorable to the plaintiff, as I must in considering a motion for summary judgment against plaintiff, I conclude that there are fatal gaps in plaintiff's proffer of evidence to show that if the cigarette had been one of an alternative design proposed by plaintiff no fire would have occurred in the circumstances of this case. Thus plaintiff's evidence cannot provide the basis for a reasoned finding by a finder of facts that the fire would not have occurred if the cigarette had been one of plaintiff's proposed alternative design.

Plaintiff has alleged that the fire at issue was started by a Marlboro Light cigarette on furniture constructed of thermoplastic outer covering (consisting of 50%/50% polyester/nylon blend and weighing 12–16 ounces per square yard), directly over non-flame retardant cotton padding. *See* Plaintiff's response to Interrogatory No. 10 of Philip Morris' First Set of Interrogatories (Exhibit 1, attached to Docket No. 74). Defendant has assumed this to be true for the purposes of the summary judgment motion, and so has the court.

Plaintiff's theory of design defect as explained in plaintiff's proffered affidavits is summarized in the following eight propositions:

1. "The method for reducing a static burning cigarette's propensity to ignite soft furnishings ... is to reduce the heat energy of the burning cigarette tip (coal) through one or a combination of any of the following parameters: 1) reduced circumference; 2) reduced tobacco packing density; 3) reduced paper porosity."

Wigand Aff. ¶ 4(a) (attached to Docket No. 66). *See also* Krasny Aff. ¶ 4(a) (attached to Docket No. 66).

2. In a National Bureau of Standards Technical Study Group (TSG) test in 1987, one commercial cigarette [not a Marlboro Light] displayed an increased propensity as compared to experimental reduced ignition propensity cigarettes to ignite furniture with a thermoplastic covering of olefin [not the same covering as the furniture in this case] over non-flame retardant cotton batting and polyurethane foam.

Krasny Aff. ¶ 4 (cc, dd), Krasny Ex. 4 (Table 3–8C from NBS Technical Note 1241) (attached to Docket No. 66).

3. In a National Institute of Standards and Technology ("NIST") laboratory test in 1993, five existing brands of "slim" cigarettes, the "Niche Brands," (including More 120, Capri Light 100, Eve Light 100, More White Light 120, and Virginia Slim Superslims 100) displayed a reduced propensity compared to conventional cigarettes, to ignite a cotton material called "duck number 4." Specifically, Marlboro brand cigarettes resulted in 100% ignition, while More 120, Capri Light 100 and Eve Light 120 each had zero ignitions, More White Light had 4% ignitions, and Virginia Slims Superslims 100 had 46% ignitions.

Krasny Aff. ¶ 4(v) (attached to Docket No. 66); Wigand Aff. ¶ 4(b–f) (attached to Docket No. 66); Sharman Aff. ¶ 4(f) (attached to Docket No. 66).

4. "The available alternative design which plaintiff predicates her case upon is the design of any one of [the Niche Brands]."

Plaintiff's Memorandum of Law (Docket No. 66), at 17.

5. Any cigarette can be "reverse engineered" to conform to the "reduced igni-

tion propensity design" of the Niche Brands.

Plaintiff's Memorandum of Law (Docket No. 66), at 17. Wigand Aff. ¶ 4(m) (attached to Docket No. 66).

6. It is "improbable" that the Niche Brands would ignite furniture constructed of "thermoplastic outer covering directly over ignition-prone material."

Krasny Aff. ¶ 4(aa) (attached to Docket No. 66); Sharman Aff. ¶ 4(h) (attached to Docket No. 66).

7. This type of furniture "can be expected to be substantially more susceptible to ignition by conventional commercial cigarettes such as Marlboro Lights."

Krasny Aff. ¶ 4(bb) (attached to Docket No. 66); Sharman Aff. ¶ 4(i) (attached to Docket No. 66).

8. "The scientific basis for [the] conclusion that the low ignition propensity designs which plaintiff proposes would not ignite furniture constructed with thermoplastic fabric over untreated ignition-prone material, is that these cigarettes do *not* ignite the NIST cotton duck fabric # 4; and, cotton is *substantially* more susceptible to cigarette ignition than *any* type of thermoplastic fabric because cotton is itself susceptible to smoldering ignition from the direct heat transfer from a burning cigarette while thermoplastic material is not."

Krasny Aff. ¶ 12 (attached to Docket No. 90).

Plaintiff's affidavits are based on an assumed inference that furniture consisting of thermoplastic outer covering placed directly over non-flammability treated cotton padding can be expected to be substantially more prone to ignition by "conventional commercial cigarettes" than by the Niche Brands. Krasny Aff. ¶ 4(aa), (bb) (attached to Docket No. 66). This statement of expectations is purportedly based upon the results of the test work performed by the National Institute for Standards and Technology (NIST), in which testing of various cigarettes is performed on a cotton duck number 4 fabric. *See* Krasny Aff. ¶ 4(v) (attached to Docket No. 66) Krasny Aff. ¶ 12 (attached to Docket No. 90). This stated expectation involves an inferential leap for which no reasoned basis is proffered, and thus does not survive reasoned scrutiny.

The NIST study found that five existing brands of "slim" cigarettes, the "Niche Brands," (including More 120, Capri Light 100, Eve Light 100, More White Light 120, and Virginia Slim Superslims 100) displayed a reduced propensity compared to conventional cigarettes, to ignite a cotton duck number 4 fabric. Specifically, Marlboro brand cigarettes resulted in 100% ignition, while More 120, Capri Light 100 and Eve Light 120 each had zero ignitions, More White Light had 4% ignitions, and Virginia Slims Superslims 100 had 46% ignitions. Krasny Aff. ¶ 4(v) (attached to Docket No. 66). Plaintiff's expert, Dr. Hirschler, claims that he has developed a mathematical model that adequately predicts the relationship found in the NIST study between the reduction of the cigarette parameters of circumference, packing density and paper permeability and the reduction in propensity to ignite cotton duck. Hirschler Aff. ¶ 46–50 (attached to Docket No. 90). Assuming the accuracy of Dr. Hirschler's mathematical model (even though it is contested by defendant), one can draw no reasoned inference more favorable to plaintiff than merely that plaintiff has identified a specific design criterion for an alternative cigarette that displays a low ignition propensity on cotton duck number 4 in the NIST study.

The NIST study, however, is not one that produces findings that fit the facts of this case. Cotton duck number 4 is not the fabric used on the O'Neill couch, and no proffered evidence would support a reasoned finding that it bears a relevant relationship to the fabric of the O'Neill couch. Cotton duck number 4 is not even in the same category of fabrics as that on the O'Neill couch. Cotton duck number 4 is cellulosic (a category including natural fabrics as cotton, rayon, and linen) and the O'Neill couch fabric was thermoplastic (a category of synthetic fibers such as nylon, polyester and olefins). It is undisputed that cotton duck number 4 is not an upholstery fabric, and is not designed to be used for that purpose.

Plaintiff's argument is that cigarettes of the low ignition propensity designs that plaintiff proposes would not ignite furniture constructed with thermoplastic fabric over untreated ignition-prone material, because these cigarettes do not ignite the NIST cotton duck number 4, and cotton is substantially more susceptible to cigarette ignition than any type of thermoplastic fabric. I conclude that plaintiff's argument is too speculative to provide a reasoned basis for plaintiff's proposed finding, as explained more fully below.

Plaintiff's experts acknowledge that different kinds of materials used for furniture upholstery and specific fabric and padding/cushioning combinations ("substrates") have different propensities to ignite when in contact with burning cigarettes. *See* Briggs Aff. ¶¶ 3(b–d) (attached to Docket No. 66); Krasny Aff. ¶¶ 4(l–o), 4(x–z) (attached to Docket No. 66). In fact, plaintiff's experts state that "[b]ecause of the differences in substrates with regard to cigarette ignition resistance, the choice of a test substrate is *critically important* in being able to discriminate between various types of cigarettes with respect to their propensity to ignite soft furnishings." Krasny Aff. ¶¶ 4(n) (attached to Docket No. 66) (emphasis added). Dr. Krasny acknowledges that no differences in the ignition propensity of different cigarettes can be observed on most substrates—either all cigarettes ignite the substrate, or none do. Krasny Aff. ¶ 4(m), (n). Despite the critical importance of choice of substrate, the NIST study used cotton duck number 4 for the substrate, a material that is almost never used for upholstered furniture.

Plaintiff presents no evidence that would support a reasoned finding that the results of the NIST study on cotton duck number 4 can by any scientific method be extrapolated to find that the Niche Brand cigarettes would not have ignited the O'Neill couch.

Plaintiff argues that at a meeting of the American Society for Testing and Materials on December 5, 1995, an "agreement w[as] reached ... that the NIST cotton ducks behaved like 80% of the upholstery fabrics available in the market at present." Hirschler Aff. ¶ 13 (attached to Docket No. 90). Due to its ultimate vagueness, as well as the absence of any indication of any data or methodology on which it is based, this statement cannot support a reasoned inference that an alternative reduced ignition propensity cigarette design can be based on tests using cotton duck. *See Grimes v. Hoffman–LaRoche, Inc.* 907 F.Supp. 33, 37 (D.N.H. 1995) ("An expert cannot establish that a fact is generally accepted merely by saying so.") Moreover, even if I were to accept the proffered statement as supportable, there is no proffer of evidence indicating that the specific fabric on the O'Neill couch would have behaved like cotton duck, rather than behaving like the 20% of fabrics that do not behave like cotton duck.

Dr. Hirschler acknowledges that the "500–fabric" study of 500 real-world fabrics reported in the 1993 Consumer Product Safety Report found a number of "reversals" of the NIST study cigarette ignition rankings on some real-world fabrics. *See* Hirschler Aff. ¶ 18–19 (attached to Docket No. 90). Of the 500 fabrics tested in that study, only 145 were subject to cigarette ignition by a cigarette that had caused 100% ignition on cotton duck; the remaining 355 fabrics were not used any further. For 7 of the 145 fabrics tested (5%), the cigarette that performed *best* on cotton duck performed *worst* on real world fabrics; and for 13 of the 145 fabrics (9%), the cigarette that performed *best* on cotton duck performed *among the two worst* on real-world fabrics. *Id.* Without any scientific or reasoned basis, Dr. Hirschler brushes these reversals off as "relatively insignificant". *Id.* Dr. Hirschler emphasizes that on 88 of the 145 fabrics (61%), the cigarette that performed best on cotton duck continued to perform best on real world fabrics; and for 99 of the 145 fabrics (68%), the cigarette that performed best on cotton duck continued to perform among the two best on real-world fabrics. *Id.* Dr. Hirschler does not tell us, however, how many cigarettes that were identified as of mid-level ignition propensity on cotton duck retained this position on real-world fabrics, or how many cigarettes identified at either extreme of ignition propensity on cotton duck came out in the middle on real-world fabrics. Once again, there is no proffer of evidence to support a

finding that the specific fabric on the O'Neill couch would not have been one of the fabrics that produces a "reversal" or one of the fabrics that is equally ignitable by both Marlboro Lights and Niche Brand cigarettes.

Plaintiff's expert Dr. Krasny claims that the testing by the National Bureau of Standards Technical Study Group (TSG) test conducted in 1987 "lends some support" to his conclusion. Krasny Aff. ¶ 11 (attached to Docket No. 90). In that test, one commercial cigarette (not a Marlboro Light) displayed an increased propensity as compared to experimental reduced-ignition-propensity cigarettes to ignite furniture with a thermoplastic covering of olefin (not the same covering as the furniture in this case) over non-flame retardant cotton batting and polyurethane foam. Dr. Krasny acknowledges, however, that the TSG test on *olefin* fabric cannot provide the basis for inferring that *thermoplastic fabric in general* would not be ignited by a cigarette conforming to plaintiff's proposed design. *Id.* Dr. Krasny agrees with defendant's experts that olefins have the lowest melting point of all thermoplastic fabrics and therefore tests conducted on olefin are simply not a sufficient basis for reasoned inferences regarding nylon or polyester. *Id.*

I conclude that a finder of facts reasoning from all of the evidence proffered by plaintiff in this case could not come to a reasoned finding that plaintiff's experts' observations regarding the NIST study on cotton duck number 4 fit the facts of this case. Plaintiff has presented no test results for Marlboro Lights or Niche Brands on the same type of thermoplastic fabric and cotton padding found in the O'Neill couch. The results of the NIST test on cotton duck number 4 cannot be extrapolated to reach conclusions as to the ignition propensity of Marlboro Lights or the Niche Brands on the O'Neill couch. Plaintiffs have presented insufficient evidence for a reasoned finding that, more probably than not, plaintiff's alternative design would have prevented the fire and that a "defect" in the design of the Marlboro Light cigarette was a cause-in-fact of the fatal fire in this case.

## VI.

I conclude, also, that plaintiff's response to defendant's motion for summary judgment fails on a second, independent, ground. It fails, as a matter of law, to surmount the hurdle that is most commonly called "duty," but is also sometimes called the part of "proximate cause" or "legal cause" that concerns limitations on scope of liability for reasons other than lack of a showing of "cause-in-fact" connection between alleged tortious conduct and the injury of which the plaintiff is complaining. Whatever the chosen terminology may be, the plaintiff has the burden of presenting a valid legal formulation regarding scope of liability and a proffer of admissible evidence sufficient to support a finding for the plaintiff on each of the factual elements that must be shown to satisfy the factual premises of that legal formulation.

Defendant summarizes its contention on this question, using the terminology of "duty," in this way:

> As a matter of law, relief cannot be granted on plaintiff's claims. Under Massachusetts law, a manufacturer cannot be held liable on a design defect claim unless it has a duty to prevent the plaintiff's injuries. The question of whether such a duty exists is one for the court. The manufacturer of a common and straightforward product is not liable if the plaintiff's harm resulted from an open and obvious risk known to be associated with the use of the product.

> Cigarettes are common and straightforward products. Because cigarettes burn, every reasonable person is aware of the potential danger of fire if lighted cigarettes are not handled with care. If the plaintiff is allowed to pursue a claim that Philip Morris's cigarettes are defective because an inebriated smoker may disregard the obvious risk and start a fire, nearly any product that is otherwise reasonably safe could be found defective when its use by an intoxicated person causes harm that some conceivable design might arguably have prevented. Because such a result would be inconsistent with Massachusetts law, Philip Morris should be awarded judg-

ment on the pleadings or, in the alternative, summary judgment.

Defendant's Memorandum (Docket No. 61), p. 3.

During extensive consultations with counsel, on the record, before final argument on defendant's motion for summary judgment, the court granted plaintiff repeated opportunities to proffer admissible evidence to support plaintiff's contention that at trial she would be able to present evidence sufficient for a determination of "duty" (or "proximate cause" or "legal cause") in plaintiff's favor, either by the court, or by the jury, or by the two acting together in their respective spheres of responsibility, whichever was determined to be the appropriate decisionmaker of this mixed-legal-factual issue.

To support her theory of scope of liability based on defect in design, plaintiff must proffer evidence sufficient to support a determination of this issue favorably to plaintiff. Plaintiff's oral and written submissions before me acknowledge this burden and contend that she has satisfied it. The dispute over this issue centers, then, not on whether she has the burden but instead on whether she has satisfied it.

The plaintiff has this burden regardless of how the decisionmaking responsibility on this issue is allocated between judge and jury. This court's determination as to whether this issue must be decided favorably to defendant on defendant's motion for summary judgment (as defendant contends) may depend on exactly how the decisionmaking responsibility on this mixed-legal-factual issue is allocated under applicable law.

Massachusetts law is the source to which I must look for rules of law about the allocation of responsibility between judge and jury for deciding each aspect of this mixed-legal-factual issue in the circumstances of this case.

The Massachusetts Supreme Judicial Court, in the case of *Back v. Wickes Corp.*, 375 Mass. 633, 378 N.E.2d 964 (1978), made a statement that is focused more on the theory of tortious conduct than on the issue of scope of liability, but nevertheless may have a bearing on the scope of liability issue:

In deciding [a product design] issue, the jury must weigh competing factors much as they would in determining the fault of the defendant in a negligence case. . . . In evaluating the adequacy of a product's design, the jury should consider, among other factors, "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative deign, financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. . . ."

In balancing all of the pertinent factors the jury make a judgment as to the social acceptability of the design, and this is the same judgment originally made by the designer of the product.

*Id.* 378 N.E.2d at 970 (citations omitted).

This passage in *Back*, taken alone, may reasonably be interpreted as saying that a jury may make a judgment about some kinds of conflicting public policy considerations at least in deciding whether tortious conduct occurred and perhaps as well in deciding whether the case before the jury is within the scope (and not beyond the limits of the scope) of liability for that kind of conduct. Even if given the most favorable interpretation to plaintiff that the words will bear, however, these quoted passages, and the *Back* opinion as a whole, do not say that the Massachusetts Supreme Judicial Court has totally surrendered to the jury the function of all policy-weighing on which the scope and limits of product design liability depend. Decisions about the basic principle of liability (whether it will be negligence-based or strict), as well as decisions that bear on the scope of liability, are inevitably value-laden decisions that are deeply dependent on weighing conflicting public policy considerations and determining the extent to which some outweigh others and how to strike a balance that is consistent with public interest and with justice to all persons whose interests are affected. These kinds of policy-weighing decisions are made by the Supreme Judicial Court itself, unless it determines that they have been made by the legislature.

In a number of different contexts, the Massachusetts Supreme Judicial Court, weighing relevant considerations of public policy, has decided as a matter of law not to extend liability beyond defined limits, rather than to leave that decision to juries. In *Schofield v. Merrill*, 386 Mass. 244, 435 N.E.2d 339 (1982), for example, the Supreme Judicial Court held that a landowner does not owe a duty of care to an adult trespasser. The court recognized that the existence of such a duty must be based on "existing social values and customs," and concluded that the Legislature's failure to impose a duty of care with respect to adult trespassers "strongly suggests that there is no community consensus that landowners ought to exercise care for the safety of adult trespassers." *Id.* 435 N.E.2d at 341–342. The court noted some of the difficulties that would arise from allowing juries to make such determinations regarding the existence of a legal duty of care:

> The jury's resolution of the question would be likely to turn on such social policy concerns as the privileges that ought to attach to land ownership, or on the jury's view as to the proper allocation of the costs of serious injuries. A jury would thus determine, on a case by case basis, the existence or nonexistence of a legal duty of care. Such a determination would be unpredictable.... The jury would ... be required to determine whether present community values call for the exercise of care for the safety of foreseeable trespassers who are neither children nor known to be helplessly trapped. Such determinations are appropriately made by the court or the Legislature, as has heretofore been the practice, and not by juries.

*Id.* at 342. *See also Cyran v. Town of Ware*, 413 Mass. 452, 597 N.E.2d 1352, 1353 (1992) (town could not be held liable by homeowners for fire department's alleged negligence in responding to residential fire; deciding whether a duty exists "necessitates examination of the facts in light of existing social values and customs and appropriate public policy"); *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624, 536 N.E.2d 1067, 1070 (1989) (affirming summary judgment in favor of movie theater that showed movie that allegedly incited young filmgoer to commit a murder several miles away, and relying on "existing social values and customs," and "appropriate social policy").

In the present products liability case, the policy decisions regarding the scope of liability, as manifested by statutes and precedents, would be undermined if the jury were allowed free range to base a verdict on their policy views regarding the scope of liability. I conclude that Massachusetts courts would not leave the policy question of the scope of liability for the design of cigarettes to juries, case by case. Accordingly, the question of scope of liability under Massachusetts law is one to be decided by courts, as matters of law are decided.

Plaintiff, in argument, emphasizes that the Massachusetts Supreme Judicial Court has declined to adopt a rule that designing a product so its dangerousness is obvious can be a shield against liability. *Uloth v. City Tank Corp.*, 376 Mass. 874, 384 N.E.2d 1188 (1978). It is true that the Supreme Judicial Court has done so, as it explained in *Uloth:*

> We reject any inflexible rule that negligent design of an obviously dangerous product precludes finding a manufacturer or designer liable. "The manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encourage it in its obvious form."

*Id.*, 384 N.E.2d at 1192–93 (citation omitted).

Also, in Massachusetts, as elsewhere generally, a manufacturer must "anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Back v. Wickes Corp.*, 375 Mass. 633, 378 N.E.2d 964, at 969 (1978). To evaluate the reasonableness of a product's design, the finder of facts should consider:

> the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product

and to the consumer that would result from an alternative design.

*Id.,* 378 N.E.2d at 970 (citation omitted).

The *Uloth* case involved the design of a garbage truck packing blade that severed a refuse collector's foot. The *Back* case involved the design of the motor home fuel tank that exploded after an accident. In contrast to these cases involving more complex mechanical designs, Massachusetts courts have continued, even after *Uloth* and *Back* were decided in 1978, to refuse to impose liability on manufacturers for injuries resulting from common, everyday products whose obvious dangers are known to be associated with the use of the product.

In *Killeen v. Harmon Grain Products, Inc.,* 11 Mass.App.Ct. 20, 413 N.E.2d 767 (1980), for example, the Massachusetts Appeals Court upheld a directed verdict for the manufacturer of a cinnamon–flavored toothpick that punctured the lip of a ten-year-old who fell from playground equipment while sucking the toothpick. Plaintiff claimed in part that the toothpick was defective because it was "pointed at both ends, rather than being somewhat rounded at one end." *Id.,* 413 N.E.2d at 769–70. The court noted that the toothpick, an "everyday item," was "exactly what it was represented to be, neither more nor less, with no hidden dangers or unpredictable propensities," and that such an everyday item could not be deemed "unreasonably dangerous" merely because it might foreseeably cause injuries. *Id.* The court stated:

> Toothpicks, like pencils, pins, needles, knives, razor blades, nails, tools of most kinds, bottles and other objects made of glass, present obvious dangers to users, but they are not unreasonably dangerous, in part because the very obviousness of the danger puts the user on notice. It is part of normal upbringing that one learns in childhood to cope with the dangers posed by such useful everyday items. It is foreseeable that some will be careless in using such items and will be injured, but the policy of our law in such cases is not to

shift the loss from the careless user to a blameless manufacturer or supplier.

*Id.* 413 N.E.2d at 770.

The *Killeen* case followed the pre-*Uloth* and pre-*Back* line of cases regarding common, straightforward products. In *Vincent v. Nicholas E. Tsiknas Co., Inc.,* 337 Mass. 726, 151 N.E.2d 263, 265 (1958) the court refused to impose liability on the manufacturer of a glass baby food jar that broke when plaintiff attempted to open it with an implement intended for punching holes in metal cans, noting that opening a glass jar is a common and uncomplicated procedure, that the manner in which plaintiff had attempted to remove the lid "inevitabl[y]" increased the pressure on the glass shoulder, and that "[t]he propensity of glass to break under pressure is common knowledge."

In *Tibbetts v. Ford Motor Company,* 4 Mass.App.Ct. 738, 358 N.E.2d 460, 462 (1976), the court declined to hold the manufacturer liable for injuries that occurred when the plaintiff inserted his fingers into a decorative slot on an automobile wheel cover and pulled on it, stating that the sharp-edged slot "must be classed with a great many other common fixtures, projections, surfaces, corners, and edges found in vehicles and elsewhere as a result of which significant injuries are possible but are not reasonably to be anticipated."

Federal courts applying Massachusetts law after *Uloth* and *Back* have also followed the reasoning of the *Tsiknas, Tibbetts,* and *Killeen* cases.

In *Venezia v. Miller Brewing Co.,* 626 F.2d 188 (1st Cir.1980), the First Circuit Court of Appeals refused to hold a manufacturer liable for injuries caused when an eight-year-old threw a glass bottle against a light pole. The plaintiff argued that the design of the bottle was defective because the walls of the bottle were too thin. The court held that no reasonable consumer could expect that a glass beer bottle could withstand being thrown against a light pole.

In *Mavilia v. Stoeger Industries,* 574 F.Supp. 107, 110–111 (D.Mass.1983) the court held that a manufacturer of handguns was not liable for injuries to an innocent bystand-

er, stating that the fact "that death may result from careless handling of firearms is known by all Americans from an early age".

In *Stuto v. Corning Glass Works,* No. CIV. A. 88–1150–WF, 1990 WL 105615, at *4 (D.Mass., July 23, 1990), the court held that a manufacturer of a ceramic plate was not liable for injuries to a woman who fell on the plate on a brick stoop, stating that "no reasonable consumer could expect that a glass plate would not shatter beneath the weight of a grown adult."

Plaintiff acknowledges, as indeed in reason one must, that the risk of upholstery ignition by a lit cigarette is an obvious danger of a common product with which the ordinary consumer is readily familiar. *See* Plaintiff's Memorandum of Law (Docket No. 66), p. 2. Plaintiff contends, however, that despite the obvious danger that a lit cigarette poses to upholstered furniture, defendant has a duty to design its cigarettes with a reduced propensity to ignite upholstered furniture. In various contexts, as explained above, Massachusetts courts and federal courts applying Massachusetts law have refused to extend the scope of liability of manufacturers to injuries resulting from common, everyday products whose obvious dangers are known to be associated with the use of the product. In the present case, then, plaintiff is in effect requesting a decision of this court that would represent an expansion of the scope of products liability on a theory of design defect well beyond that authorized by existing statutes and precedents in Massachusetts. My prediction is that the Massachusetts Supreme Judicial Court is very unlikely to approve such an expansion of liability, absent a manifested statutory authorization for doing so. This is a prediction of outcome that can be confidently made. I need not and do not undertake to predict precisely where critical lines may be drawn along the spectrum of imaginable cases, or the precise choice of terminology (for example, duty, or proximate cause, or simply a limit on scope of liability as a public policy choice implicit in legislation and precedent). The predictable outcome being clear, summary judgment is appropriate. In these circumstances, it is especially inappropriate for a federal court to be decid-

ing an issue of first impression favorably to an expansion of the scope of liability beyond existing Massachusetts authority.

### INTERLOCUTORY ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) The Motion by Philip Morris, Inc., for Judgment on the Pleadings, or in the Alternative, for Summary Judgment (Docket No. 60, filed March 17, 1995) is ALLOWED.

(2) The Clerk will schedule a conference to consider whether any party wishes to be heard on any other matter before entry of final judgment.